UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIERRA CLUB,**<br><br>    **Plaintiff,**<br><br>        v.<br><br>**UNITED STATES FISH AND WILDLIFE SERVICE,**<br><br>    **Defendant.** | Civil Action No.  19-2315 (JEB) |

**MEMORANDUM OPINION**

      In early 2018, Plaintiff Sierra Club learned that Defendant United States Fish and Wildlife Service had initiated a review of the Florida Key deer's place on the endangered-species list. Hoping to uncover the agency's reasons for this review and any information it relied upon, Sierra Club filed a Freedom of Information Act request. Frustrated with the agency's delayed response, it then filed this suit. In dueling Motions for Summary Judgment, the parties dispute only FWS's invocation of FOIA Exemption 5's deliberative-process privilege to shield certain documents. Although the Court planned to fully resolve this case, it was stymied by the agency's cursory briefing on several seminal points. As a result, the Court delivers a split decision: it will order the release of some records while also directing Fish and Wildlife to more fully support its position should it wish to continue withholding others.

**I.    Background**

      Little need be said to tee up the narrow issues in this case. On February 6, 2018, the Miami Herald reported that Fish and Wildlife had undertaken a review of the Florida Key deer to determine whether the species should be removed from the endangered-species list or

1

downgraded from "endangered" to "threatened." ECF No. 1 (Compl.), ¶ 2. In the article, a FWS spokesperson confirmed the report, stating that the agency was "finishing up an evaluation related to the status of the Key deer required under the Endangered Species Act." Id., ¶ 3. The import of this potential change is significant: the species has been protected under the Endangered Species Act and its predecessor statute since 1967, and Plaintiff believes that recent events have only increased the existential threats to the species. See ECF No. 20 (Pl. MSJ & Opp.) at 1–2.

Just weeks after publication of the article, Sierra Club — an organization "whose mission includes educating and enlisting humanity to protect" wildlife — filed a FOIA request with Fish and Wildlife to obtain records "relate[d] to the ongoing species status review for the Florida Key deer (*Odocoileus virginianus clavium*)." Pl. MSJ & Opp. at 2–3 (citation omitted). Plaintiff sought "[a]ll records generated since November 2016" pertaining to the review, including records regarding the impetus for the review, the scientific information provided to and generated by the agency, and any communications discussing the status and conservation of Florida Key deer. See Compl., ¶ 47.

After acknowledging receipt, FWS informed Plaintiff that its request had been placed in the "exceptional/voluminous" processing track but failed to provide an estimated completion date. Id., ¶ 49. Apart from some minor administrative communications, Plaintiff did not hear from Fish and Wildlife again until September of that year, when it released three pages of records as a "partial response." Id., ¶¶ 54–55. The agency indicated that it had withheld further documents, principally invoking Exemption 5. Id., ¶ 55.

Almost a year later, after receiving nothing further, Plaintiff filed this suit. Id., ¶¶ 56–60. Over the course of this litigation, Defendant has turned over 936 pages of responsive documents

in full and portions of another 178 pages. See ECF Nos. 10, 11, 13 (Joint Status Reports). It has withheld a total of 251 pages in full under Exemptions 5 and 6. Id.

According to Sierra Club, the most notable withheld pages include the final and draft copies of the agency's Species Status Assessment (SSA) report on the deer, as well as communications regarding the production of the report. See ECF No. 19-2, Exh. D (Vaughn Index) at 1–12; Pl. MSJ & Opp. at 8. The SSA report is a scientific report compiling an array of biological information on a species, developed to inform assessments under the Endangered Species Act. See Pl. MSJ & Opp., Exh. 13 (SSA Framework Fact Sheet); id., Exh. 15 (FWS Letter Describing SSA). It is intended as a "highly integrated, explicit, and scientifically based" foundation to "evaluate the biological and conservation status of a species." FWS Letter Describing SSA. As the agency explains, the SSA "provides the best available scientific information for comparison to policy standards to guide" agency decisions. See SSA Framework Fact Sheet at 2.

Fish and Wildlife began work on the SSA report in July 2017. See Compl., ¶¶ 39–41. By October of that year, the first draft was circulated to a Florida state conservation agency. Id., ¶ 42. FWS produced an updated draft in November 2017 and another in December 2017, before "complet[ing]" the report in January 2018. See Pl. MSJ & Opp. at 8 nn.2–3.

Defendant has withheld under the deliberative-process privilege covered by Exemption 5 the final January 2018 SSA report; prior full drafts of the report; "comments by FWS scientists and other scientific experts on the contents of the SSA report"; "the peer review comments of external scientists on the contents of the SSA report"; and portions of "communications discussing the factual information in the SSA report." Id. at 8. Although there were earlier disputes about the adequacy of FWS's search and its redactions pursuant to Exemption 6, all that

3

now remains is Plaintiff's challenge to the deliberative-process withholdings, which the parties have briefed in Cross-Motions for Summary Judgment.

**II.     Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment, and the agency bears the ultimate burden of proof. See Defenders of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007); see also DOJ v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989). The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).

**III.     Analysis**

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted). The statute thus provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules[,] . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). The Government need not, however, turn over requested information that falls within one of nine statutorily created exemptions. Id. § 552(b)(1)–(9). This Court can compel the release of any records that do not satisfy the requirements of at least one exemption. See 5 U.S.C. § 552(a)(4)(B); U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989).

"FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)). In making this determination, the court "[a]t all times . . . must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'" Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

A "veritable avalanche of FOIA-related precedent" guides this Court's determination of whether Fish and Wildlife has carried its burden of establishing that a given exemption applies. Ullah v. CIA, 435 F. Supp. 3d 177, 182 (D.D.C. 2020). To show that certain information is exempt from FOIA, "an agency may file 'affidavits describing the material withheld and the manner in which it falls within the exemption claimed.'" Bin Ali Jaber v. U.S. Dep't of Def., 293 F. Supp. 3d 218, 224 (D.D.C. 2018) (quoting King v. U.S. Dep't of Justice, 830 F.2d 210,

217 (D.C. Cir. 1987)).  Ultimately, "when an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant."  Morley v. CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting King, 830 F.2d at 219).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting Wolf v. CIA, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The Court begins with an examination of Exemption 5 and concludes with a brief discussion of segregability.

  A. Exemption 5

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Withholdings are restricted to "those documents, and only those documents, normally privileged in the civil discovery context."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 798–99 (1984).  The exemption encompasses three distinct components — namely, the deliberative-process privilege (sometimes referred to as "executive privilege"), the attorney-work-product privilege, and the attorney-client privilege.  See Am. Immigr. Council v. U.S. Dep't of Homeland Sec., 905 F. Supp. 2d 206, 216 (D.D.C. 2012).  Here, Fish and Wildlife only invokes the deliberative-process privilege.

That privilege shields internal agency "advisory opinions, recommendations and deliberations" in order to "protect[] the decision making processes of government agencies." Sears, 421 U.S. at 150 (citations and internal quotation marks omitted).  It rests on the understanding that "if agencies were forced to 'operate in a fishbowl,'" the "quality of

administrative decision-making would be seriously undermined . . . because the full and frank exchange of ideas on legal or policy matters would be impossible." Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977) (citations omitted).

In addition to constituting an inter- or intra-agency communication, a record must meet two requirements to qualify under this privilege. First, it must be predecisional — *i.e.*, "generated before the adoption of an agency policy." Judicial Watch, Inc. v. U.S. Dep't of Def., 847 F.3d 735, 739 (D.C. Cir. 2017) (citation omitted). Second, a record must be deliberative — *i.e.*, "reflect[ing] the give-and-take of the consultative process." Id. (citation omitted). In this way, Exemption 5 focuses on documents containing information that composes "part of a process by which governmental decisions and policies are formulated." Sears, 421 U.S. at 150 (citation and internal quotation marks omitted). Finally, even when a record meets those requirements, the agency must also demonstrate that it "reasonably foresees that disclosure would harm an interest protected by" the exemption. Rosenberg v. U.S. Dep't of Def., 442 F. Supp. 3d 240, 256 (D.D.C. 2020) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).

The good news for the reader here is that Sierra Club's challenge is quite narrow. It concedes that the produced documents are both predecisional and constitute inter-agency or intra-agency memoranda or letters, thus satisfying two of the three requirements to bring records within the exemption. See Pl. MSJ & Opp. at 9. What remains is Plaintiff's contention that three types of documents are not deliberative: the final SSA report on the deer; the three earlier drafts of the report; and comments and "communications identifying the existence of scientific information" relevant to the report. Id. at 14, 19. The Court looks at each type of document separately before considering whether FWS has shown foreseeable harm from release of the documents.

7

*1. Final SSA Report*

Start with the final SSA report from January 2018, which presents an easy call for release. In its briefing, Fish and Wildlife makes only a perfunctory argument for withholding, broadly claiming that the report is "a draft" that constitutes "internal work product that informs its associated decision." ECF No. 19 (Def. MSJ) at 5. Yet, Defendant provides no support for either position beyond the declaration of one of its FOIA coordinators that simply repeats the above language. See ECF 19-2 (Declaration of Tiffany McClurkin), ¶¶ 39–40. Sierra Club counters that the report is final and, according to the agency itself, is "a factual, scientific report that is developed independently from any policy decision" and thus cannot be deliberative. See Pl. MSJ & Opp. at 8, 14–15; see also FWS Letter Describing SSA.

On its face, a factual scientific report, produced "independently from any" regulatory or policy decisions, see FWS Letter Describing SSA, does not qualify as deliberative. According to Defendant, the SSA report "begin[s] with a compilation of the best available information on the species . . . and its ecological needs," before "decrib[ing] the current condition" of the species and "forecast[ing] the species response to probable future scenarios of environmental conditions and conservation efforts." Id. As Fish and Wildlife emphasizes in its own descriptions of the SSA framework, the final report is meant "to aid decision makers who must use the best available scientific information to make policy decisions." SSA Framework Fact Sheet at 2. Nothing in this description indicates that the report contains "advisory opinions, recommendations[, or] deliberations" regarding the agency process at issue. Sears, 421 U.S. at 150; see also Pub. Citizen, Inc. v. OMB, 598 F.3d 865, 876 (D.C. Cir. 2010) ("Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld."). Nor does it help show that the report may reflect anything that can be

8

construed as a personal opinion of an agency official. See Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) ("The exemption thus covers . . . subjective documents which reflect the personal opinions of the writer."). Simple relevance to the policy-making process is not sufficient to bring a document within the ambit of Exemption 5. See Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Homeland Sec., 648 F. Supp. 2d 152, 158–59 (D.D.C. 2009) (requiring disclosure of records in which "no agency policy is being debated or discussed" even though the "[records] are, in the most general sense, part of an intra-agency discussion relating" to agency's decisionmaking). A purely factual scientific report that is untethered from direct policy- or decisionmaking does not constitute a record "so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency." Coastal States, 617 F.2d at 866.

The sum total of FWS's reasoning on this point seems to be that it views every document as a draft "until the associated decision is published in the Federal Register," and drafts are protected under Exemption 5. See Def. MSJ at 5; ECF No. 22 (Def. Reply) at 2. But the key deliberative-process inquiry is a functional one: courts ask whether disclosure is likely "to stifle honest and frank communication within the agency," not whether the document fits into a pre-determined category. See Coastal States, 617 F.2d at 866. Under this functional inquiry, the Court finds that release of the report would in no way "stifle" conversation within the agency, as it contains no personal opinions, no recommendations, no deliberations, and nothing that would cause the agency's decisionmakers to "temper candor" in their remarks out of "a concern for appearances." National Sec. Archive v. CIA, 752 F.3d 460, 462 (D.C. Cir. 2014) (quoting United States v. Nixon, 418 U.S. 683, 705 (1974)).

Finally, contrary to Defendant's claims, the January 2018 report appears not to be a draft at all. Plaintiff establishes a compelling factual record of the agency itself treating the document as final. In written communications, it referred to the report as "completed in January 2018" and detailed plans to release it to the public in August 2019 after a public information meeting about the status of the deer. See Pl. MSJ & Opp. at 8 n.2; see also id., Exh. 16 at 1 (Timothy Merritt Email), Exh. 4 at 3–4 (Karimah Schoenhut Letter). In the Court's view, both serve as clear indicators of finality. Nor does Defendant point to any authority — either judicial or administrative — for its contention that SSA reports are considered non-final until "the associated decision is published in the Federal Register." Def. MSJ at 5. Because Fish and Wildlife provides no other evidence or argument that the final SSA report is deliberative, the Court finds that the privilege does not shield it from disclosure.

2. *Draft SSA Reports*

The deliberative character of the next set of documents is more difficult to assess, thanks in large part to the cursory nature of the agency's briefing. Sierra Club seeks access to three prior drafts of the SSA report, claiming that they are purely factual. See Pl. MSJ & Opp. at 11. These reports, it bears noting, appear in segments and constitute no fewer than 24 entries in the Vaughn Index. Id. at 8 nn.3–4; see also Vaughn Index at 5–11. Unsurprisingly, Fish and Wildlife rejoins that these draft documents fall within Exemption 5, see Def. MSJ at 5, emphasizing that the drafting process is naturally deliberative, as the agency must "identify important issues, share scientific information and brainstorm potential avenues for tracking species." McClurkin Decl., ¶ 47.

FWS is broadly correct inasmuch as the deliberative-process privilege has frequently been held to cover draft documents. See Def. Reply at 2 (citing Almeda v. U.S. Dep't of Educ.,

10

No. 17-2641, 2020 WL 601628, at *3 (D.D.C. Feb. 7, 2020) ("The deliberative process privilege protects not only the content of drafts, but also the drafting process itself.")). This makes sense, as Exemption 5 is designed to shield the "process by which governmental decisions and policies are formulated." Petroleum Info. Corp. v. Dep't of the Interior, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing Sears, 421 U.S. at 150); see also Coastal States, 617 F.2d at 866 (finding document deliberative when "it reflects the give-and-take of the consultative process"). Such deliberations are more clearly seen in draft documents, where the process of decisionmaking unfolds over time and is manifested in the changes between versions.

Sierra Club counters that purely factual material is not protected even in drafts. See Pl. MSJ & Opp. at 11–12, 14. Yet, while the privilege does not generally extend to mere factual recitations, see In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997), "the D.C. Circuit has cautioned against overuse of the factual/deliberative distinction." Goodrich Corp. v. U.S. EPA, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (citing Dudman Commc'ns Corp. v. U.S. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). Such hesitation stems from the recognition that the drafter's selection of facts can itself reveal the decisionmaking process. See, e.g., Mead Data, 566 F.2d at 256; Montrose Chem. Corp. of Cal. v. Train, 491 F.2d 63, 68 (D.C. Cir. 1974). And the privilege "protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982); see also Mapother v. Dep't of Justice, 3 F.3d 1533, 1539 (D.C. Cir. 1993) ("[T]he privilege serves to protect the deliberative process itself, not merely documents containing deliberative material").

That said, the agency is far from in the clear here since it "fail[s] to provide necessary contextual information about the particular decisionmaking processes to which the [draft SSA reports] contributed, and the role the [drafts] played in those processes." Elec. Frontier Found. v. U.S. Dep't of Justice, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (citing Hinckley v. United States, 140 F.3d 277, 284 (D.C. Cir. 1998) ("The agency must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process.")). In its Vaughn Index describing the documents Plaintiff seeks, Fish and Wildlife provides nothing more than vague entries restating the legal requirements of Exemption 5. See, e.g., Vaughn Index at 10 (describing December 2017 draft only with reference to buzzwords associated with deliberative-process privilege and without any discussion of context).

"A document's context is the *sine qua non* of the court's assessment of whether or not the document is . . . deliberative." Conservation Force v. Jewell, 66 F. Supp. 3d 46, 61 (D.D.C. 2014), aff'd, No. 15-5131, 2015 WL 9309920 (D.C. Cir. Dec. 4, 2015). "For example, '[a] document from a junior to a senior is likely to reflect . . . subjective opinions'" and thus may rightly come within Exemption 5. Id. at 61 (quoting Access Reports v. Dept. of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991)). This is especially true where agency employees distill voluminous records into factual summaries for higher-ups. See Montrose Chemical, 491 F.2d at 70–71 (granting protection in such a situation). In contrast, a document "moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." Access Reports, 926 F.2d at 1195. Similarly, documents that do not "invite a response from the requesting official" are not likely to satisfy Exemption 5 requirements. Schlefer v. United States, 702 F.2d 233, 243 (D.C. Cir. 1983).

FWS's Vaughn entries provide little to no information as to the "identities, positions, and job duties of any of the authors or recipients of the withheld documents" or the manner in which the documents were created — *e.g.*, how drafters culled particular information.  Conservation Force, 66 F. Supp. 3d at 61 (citing SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1204 (D.C. Cir. 1991)) (agency did not meet Exemption 5 burdens where it failed to "explain such matters as how decisions like those in issue are reached; the role that staff discussion and memoranda play in such decisions; the manner in which such decisions are memorialized and explained; and whether such decisions are treated, in later agency decisionmaking, as precedents").  Just as in Conservation Force, "this Court simply cannot properly determine whether the deliberative process privilege applies."  Id.  Stated more plainly, this Court has very little idea of how SSA reports are drafted, for whom, and who directs the editing process.  Without any sense of the process, the Court is hesitant to rule on their deliberative nature.

The context may be especially important here, where the Endangered Species Act requires FWS decisionmakers to act "solely on the basis of the best scientific and commercial data available."  16 U.S.C. §§ 1533(b)(1)(A), 1536(a)(2); see Pl. MSJ & Opp. at 11.  The SSA framework "is an analytical approach developed by [FWS] to deliver foundational science for informing all Endangered Species Act (ESA) decisions."  SSA Framework Fact Sheet at 1.  Although Defendant spends some time dissecting the interpretation of "best," noting "disagreement within the scientific community" and "assumptions and uncertainties" inherent in scientific information, see ECF No. 22-1 (Supplemental Declaration of Tiffany McClurkin), ¶ 2, creation of an SSA report "does not appear to involve the breadth of discretion, and the wide range of considerations, the many forecasts and 'judgment calls' involved in making" the kinds of policy determinations protected by the deliberative-process privilege.  Petroleum Infor. Corp.,

13

976 F.2d at 1438; see also Ctr. for Biological Diversity v. EPA, 279 F. Supp. 3d 121, 150–52 (D.D.C. 2017).

It may well be the case, nonetheless, that the draft SSA reports are deliberative, and that their disclosure "would expose [Fish and Wildlife's] decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine [its] ability to perform its functions." Dudman, 815 F.2d at 1568. As iterative analyses are hallmarks of records to which the privilege often applies, the Court will provide Defendant another opportunity to explain "with reasonably specific detail" how the information at hand "logically falls within" Exemption 5. Elec. Frontier Found. v. DOJ, 739 F.3d 1, 7 (D.C. Cir. 2014) (citation omitted); see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 955 F. Supp. 2d 4, 18–19 (D.D.C. 2013) (requiring agency to provider more robust explanations for withholdings in comparable circumstances). It expects that any renewed effort will remedy the various shortcomings identified here.

### 3. Comments on and about SSA Reports

The final category of documents at issue consists of email communications about the content and development of the SSA reports and comments thereon by internal and external experts. See Pl. MSJ & Opp. at 8. These are the most likely of all the documents discussed so far to be deliberative in nature. Documents in which agency staff and consultants discuss development of the reports may plausibly "reflect the give and take of the deliberative process." Public Citizen, 598 F.3d at 876. The comments and communications thus strike the Court as likely to be quintessential "advisory opinions, recommendations, [or] deliberations" protected under Exemption 5. Sears, 421 U.S. at 150 (citation omitted).

Unfortunately for the agency, it neglects to provide the Court with specifics of what these records contain, who drafted them, and why they should be considered deliberative. In fact, much of Defendant's abbreviated briefing focuses exclusively on the reports themselves, ignoring these other records. See Def. MSJ at 3–5; Def. Reply at 2–3.

As with the draft SSA reports, because internal communications are prototypical records to which the deliberative-process privilege usually applies, the Court will allow Defendant a final chance to sufficiently explain why the information at hand comes within Exemption 5.

The Court should also note that Plaintiff has requested that the Court conduct an *in camera* review of nine documents that fall within this category. See Pl. MSJ & Opp. at 30–32. "[D]istrict court judges [have] broad discretion in determining whether *in camera* review is appropriate." Wild Horse Freedom Fed'n v. U.S. Dep't of the Interior, Bureau of Land Mgmt., 316 F. Supp. 3d 315, 318 (D.D.C. 2018) (quoting Armstrong v. Exec. Office of the President, 97 F.3d 575, 577–78 (D.C. Cir. 1996) (second alteration in original). As this Court has noted elsewhere:

> *In camera* review . . . is "not a substitute for the government's obligation to provide detailed public indexes and justifications whenever possible." Lykins v. U.S. Dep't of Justice, 725 F.2d 1455, 1463 (D.C. Cir. 1984) . . . . As the D.C. Circuit noted in Lykins, the government's documentary obligations not only enable the reviewing court to make an informed and accurate determination, but they also allow the adversary system to operate effectively and encourage transparency by "forc[ing] the government to analyze carefully any material withheld." [Id.] at 1463.

Am. Immigr. Council v. U.S. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 235–36 (D.D.C. 2013).

Here, because the Court is already requiring further analysis, it makes sense to request that Fish and Wildlife more fully address the deliberative character of these documents before

15

resorting to the "generally disfavored" tool of *in camera* review. Id. (quoting PHE, Inc. v. Dep't of Justice, 983 F.2d 248, 253 (D.C. Cir. 1993)).

### 4. *Foreseeable Harm*

Before concluding its analysis of the deliberative-process privilege, the Court looks at one additional point Sierra Club raises. In the context of Exemption 5, "an agency may withhold information — even if it falls within the four corners of the exemption — 'only if . . . the agency reasonably foresees that disclosure would harm an interest protected by' [that] exemption." Rosenberg, 442 F. Supp. 3d at 256 (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). To satisfy this standard, an agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials," and it must "connect [such] harms in a meaningful way to the information withheld." Ctr. for Investigative Reporting v. U.S. Customs & Border Patrol, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (cleaned up) (citation omitted). While "boilerplate" articulations of harm are insufficient, id. (citation omitted), the government need not "identify harm likely to result from disclosure of each of its Exemption 5 withholdings." Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 79 (D.D.C. 2018). Rather, it "may take a categorical approach" and "group together like records," explaining "the foreseeable harm of disclosure for each category." Id. at 78.

In keeping with the general character of its briefing, Fish and Wildlife offers little to substantiate its claims of foreseeable harm from the disclosure of the draft reports or the communications surrounding them. See McClurkin Decl., ¶ 40; McClurkin Decl., ¶ 3. Beyond offering the boilerplate that release in general "would cause a chilling effect to the agency and would stifle internal communications," id., Defendant repeatedly contends that "[p]re-mature

16

release would be confusing to the public" in light of the fact that the agency has not yet made a determination on the status of the deer. See Vaughn Index at 1–12. The Court remains unpersuaded that a non-specific fear of confusion suffices to meet the agency's burden. Should FWS wish to keep the draft SSA reports and corresponding communications confidential, the Court expects a more robust justification on this score in supplemental submissions.

### B. Segregability

The last concern Plaintiff notes addresses whether the agency has sufficiently segregated properly redacted material from what should be released. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). While Fish and Wildlife is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," Hodge v. FBI, 703 F.3d 575, 582 (D.C. Cir. 2013) (alteration in original) (citation omitted), this presumption of compliance does not obviate the agency's obligation to carry its evidentiary burden and fully explain its decisions on segregability. See Mead Data, 566 F.2d at 261–62. To do so, the agency must provide "a 'detailed justification' and not just 'conclusory statements' to demonstrate that all reasonably segregable information has been released." Valfells v. CIA, 717 F. Supp. 2d 110, 120 (D.D.C. 2010) (citation omitted); see also Armstrong, 97 F.3d at 578 (determining that government affidavits explained nonsegregability of documents with "reasonable specificity"). "Reasonable specificity" can be established through a "combination of the Vaughn index and [agency] affidavits." Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002).

All Defendant offers on the matter is its conclusory assertion that it has "carefully reviewed the responsive records on a line-by-line and page-by-page basis." Def. MSJ at 7; see

also McClurkin Decl., ¶ 68 (same).  That alone will not discharge the agency's "obligation to carry its evidentiary burden and fully explain its decisions on segregability."  Am. Immigr. Council, 950 F. Supp. 2d at 248; see also Mead Data, 566 F.2d at 261 ("[U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts.").  Indeed, Plaintiff has highlighted several red flags undermining the presumption that Defendant has disclosed all reasonably segregable material — e.g., inconsistencies in the redaction of the same information across records.  See Pl. MSJ & Opp. at 27–29.

As Fish and Wildlife renews its review of the documents at issue in this case, the Court trusts that it will carefully determine whether any reasonably segregable, non-exempt information can be released — including, for example, purely factual information that has already been released in other forms, see id. at 27–28, and any other non-deliberative text that does not qualify for protection under Exemption 5.  At the least, it will require a better explanation in any subsequent declaration.

**IV.   Conclusion**

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion for Summary Judgment, and it will deny Defendant's Motion for Summary Judgment in full.  Fish and Wildlife must turn over the final January 2018 SSA report, and a separate Order that issues contemporaneously will set forth how the parties should proceed as to the other documents.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 26, 2021